

Louis V. Fasulo, Esq.– NY & NJ
Samuel M. Braverman, Esq.– NY & NJ
Charles Di Maggio, Esq.– NY & CO

www.FBDMLaw.com
SBraverman@FBDMLaw.com

FASULO BRAVERMAN & DI MAGGIO, LLP

ATTORNEYS AT LAW

September 14, 2018

Hon. Jed S. Rakoff
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

Re:   *United States v. Thomas Reich*
Dkt.  17 Cr 482 (JSR)

Dear Judge Rakoff:

I submit this memorandum in support of Thomas Reich, who is scheduled to be sentenced by this Court on September 21, 2018, upon his plea of guilty to one count of Conspiracy to Commit Bank Fraud and Wire Fraud (18 USC §1349). For the reasons stated in the Government's sentencing memorandum which acknowledges Mr. Reich extensive cooperation and assistance to the Government and law enforcement and making a recommendation for a substantially below-guidelines sentence (below either Peter G. or Peter B. Johnson's sentence); for the reasons stated in the Bankruptcy Trustee's letter describing Mr. Reich's substantial assistance in his investigation of the Transman/Euromar bank fraud and making a recommendation for acknowledgment of Mr. Reich's work done and yet to be done; for the reasons given in the Justification section of the Final Probation Report which recommends a substantial downward departure based upon the 18 USC 3553(a) factors; and for the reasons stated herein and the attached exhibits, I respectfully request that this Court:

1.   Impose a sentence of time served, followed by 3 years of post-release supervision with six months jail to be served in home detention;

1

**225 Broadway, Suite 715**
**New York, New York 10007**
**Tel (212) 566-6213**
**Fax (212) 566-8165**

**505 Eighth Avenue, Suite 300**
**New York, New York 10018**
**Tel (212) 967-0352**
**Fax (201) 596-2724**

**Post Office Box 127**
**Tenafly, New Jersey 07670**
**Tel (201) 569-1595**
**Fax (201) 596-2724**

2.  250 hours of community service;
3.  Impose a forfeiture order not to exceed $753,772.18;
4.  Not impose a fine as this Court will impose a restitution order of $352,000,000; and
5.  Impose a $100 mandatory special assessment.

As stated in the Government's sentencing memorandum (Sept. 14, 2018, Dkt 93), soon after Mr. Reich's arrest, he began cooperating with the Government and law enforcement to explain how the fraud at Euromar and Transmar unfolded over the many years it existed. This would include, all-told, 10 in-person meetings, 10 conference calls, and more than 100 email exchanges between Mr. Reich and law enforcement or the bankruptcy counsel and investigators over nearly a year of cooperation. Mr. Reich personally reviewed more than 200,000 documents of the Government's production, and identified the most pertinent examples of the schemes for law enforcement and the Trustee to use to understand the fraud, to prosecute the fraud, and to identify recapturable assets for restitution for the victims of the fraud. (Id., pp. 5-6). (See attached Letter of Alan Nisselson, Chapter 7 Trustee of Transmar Commodity Group Ltd., dated September 12, 2018, Exhibit 1)

First, in meetings with law enforcement and the Trustee, Mr. Reich explained his own criminal conduct-how he prepared the borrowing base reports with others and submitted them to banks over most of his tenure, knowing that the reports were false and the banks would rely upon them in their lending decisions. He identified the parties involved in the scheme, how money flowed between the companies, and who had supervisory power over others sufficient to continue the fraud. (Dkt 93)

Second, he described when he learned, directly from the prior Chief Financial Officer, of the fraudulent scheme employed Transmar and Euromar and the Johnsons to create "circle transactions" that would create fake assets and revenue upon which Euromar/Transmar could borrow additional funds, as well has paper over the "hole" of debt (as the Johnsons and the former CFO called the ever expanding discrepancy between what the Johnsons had and what they owed). After Mr. Reich had been at Transmar for several months, the former CFO took Mr. Reich out to lunch and, for the first time, laid out the falsity in the Transmar books, and then to an incredulous and uncomprehending Mr. Reich, literally diagrammed the fraud for Mr. Reich.

2

(See attached ledger as of April 13, 2012, used at the actual meal described above, indicating "official balance" versus "true receivables from Euromar", as well as the former CFO's handwritten diagram and explanation of the use of "circles". Exhibit 2) This establishes beyond a reasonable doubt that the fraud that ultimately brought down Euromar and Transmar had been in place well before Mr. Reich arrived.

Peter B. would later memorialize this fact in an email entitled "Hole" dated July 1, 2016 to his brother and to his father Peter G. (Exhibit 3) In it, Peter B. writes:

Dad/Tim:

Was thinking this evening about the cause of the hole. I think that the hole itself can be the cause of the growing hole.

Since we are about 6-7 years into the usage of various tactics of drawing against the Borrowing Base to fill collateral gap. Dick [Former CFO Dick Krysty] was an expert in the game of "reversing invoices", which was essentially another version of the shenanigans employed today.

But assuming there was a real loss at some point which required us to take on Amerra in the first place, the usage of Amerra alone is likely to have accumulated to huge figure.

Just food for thought.

Rgds,
Peter B. Johnson
Transmar Group

This email demonstrates that 1) the fraud was in place *since before 2010*, well before Mr. Reich began work at Transmar; 2) that the former CFO was the creator of the scheme, either with the Johnsons direction or at least with their blessings and explicit knowledge; 3) Peter B. identified himself as a Transmar person, intimately aware of the inner workings of Transmar, and not a Euromar person 3000 miles away from the fray, and finally 4) the owners of the company themselves didn't blame Mr. Reich for their own, self-created disaster.

3

225 Broadway, Suite 715
New York, New York 10007
Tel (212) 566-6213
Fax (212) 566-8165

505 Eighth Avenue, Suite 300
New York, New York 10018
Tel (212) 967-0352
Fax (201) 596-2724

Post Office Box 127
Tenafly, New Jersey 07670
Tel (201) 569-1595
Fax (201) 596-2724

There is of course no dispute that Mr. Reich should never have returned to work after his lunch with Dick Krysty, after he became aware of the institutionalized fraud in place at Euromar and Transmar, and for that he is now deservedly to be sentenced as a felon. Each year that he continued in his job after knowing of the scheme, each borrowing base report that he fraudulently completed, each time he directed an employee of Transmar to write something down that was false, was its own crime for which punishment is appropriate. In all the letters of supports from family, in the interview with Probation, and in the numerous meetings with law enforcement, Mr. Reich does not shirk his responsibility for his actions, nor diminish his role, nor shift the blame to someone or something else. That "stand-up-and-take-your-punishment" quality is exactly the character trait all his letters of support extoll repeatedly.

The Government describes the relative role of the players in the scheme succinctly in its sur-reply sentencing memorandum to Peter B's reply sentencing memorandum. (Sept. 14, 2018, Dkt. 92) The Government writes: "[I]t is clear from communications between Peter B. and Reich, that, at least during the period of the charged conspiracy, Peter B. exercised supervisory authority over Reich and Gary O'Conner with respect to the preparation of the BB's, . . ., and [Peter B.] provided instruction to Reich and Gary O'Connor regarding how entries should be falsified." The Government continues: "While the Government does not allege that Peter B. was the originator of the fraudulent scheme, by 2014 and through the end of 2016 when Transmar filed for bankruptcy (i.e., the time period of the charged conspiracy), he had become the creative leader of the scheme, developing new, less readily detectable methods of padding the BB's with ineligible collateral. It is clear from his email communication that, by 2014, Peter B. was directing and overseeing the inclusion of fraudulent entries in the BB's . . ." (Dkt 93, p. 2).

The Government further clarifies this issue in its sentencing memorandum for Mr. Reich, writing:

> As reflected in the plea agreement, [Mr. Reich] was a manager of this fraudulent scheme. He had employees, such as O'Connor and Pizzi, who reported to him and carried out his instructions in furtherance of the fraud. (PSR ¶¶12, 21). At the

4

same time, he reported to those above him in the hierarchy – Peter G. and Peter B. – and implemented their directives. (PSR ¶¶16-17, 20). While Reich was, in many respects, closer to the day-to-day operation of the fraudulent scheme than either Peter G. or Peter B., he did not exercise ultimate control over the company, had no authority to discipline or remove Peter G. or Peter B., and had no ownership interest in Transmar.

A sentence that appropriately reflects Reich's role in the fraudulent scheme would therefore be less than that of Peter G.  . . .

(Dkt 93, p. 10)

Trustee Alan Nisselson writes in his letter to the Court of Mr. Reich:

Thomas Reich has been extremely cooperative and responsive to requests made of him by me, my counsel, and counsel for the group of banks that were defrauded. He has met with us and participated in numerous conference calls. He has also devoted a significant amount of time to reviewing hundreds of email communications as well as transaction documents. His analysis and insights into Transmar's complex business dealings with third parties and affiliates, including the scheme to defraud the bank group, have been invaluable. Mr. Reich has been particularly helpful by offering ideas on potential asset recoveries and I anticipate that this will lead to my pursuing claims to recover millions of dollars for the benefit of Transmar's creditors.

Beyond his cooperation and assistance to date, Mr. Reich appears to readily accept part of the responsibility for the demise of Transmar and the losses that it caused to others.

I would hope that whatever the Court decides as to Mr. Reich's sentence, that he will be able to continue to work with us in our asset recovery effort.

It should be noted by the Court that the amount of the forfeiture agreed to by Mr. Reich in his plea with the Government was the *entirety* of his income from Transmar for the *entirety* of his tenure there. He will receive, therefore, no compensation whatsoever for his five years of work, much of it doing the legitimate operations of a world-wide commodities company. Such is the penalty for being part of a serious fraud.

Mr. Reich, 60 years old, grew up in Brooklyn, New York, the son of a treasurer for a construction company and a special education teacher. He has two sisters who live in New

5

Jersey (a sonogram technician and a homemaker), two sons who live in Manhattan (both in finance), and his wife of 35 ½ years Joanne, who is a registered nurse and the vice president of quality and risk management at the Jersey City Medical Center. As he has never had any prior contact with the criminal justice system, Mr. Reich is a Criminal History Category I based upon 0 criminal history points. The only other time Mr. Reich had contact with law enforcement prior to the instant matter was when he pushed his son out of the way of an out-of-control truck and needed to be carted off in an ambulance.

Probation goes on to recommend a non-guideline sentence based upon numerous reasons set forth in the final PSR including the extensive and consistent positive personal history of Mr. Reich, the depth of his remorse, the extremely unlikely chance of recidivism, and the Probation officer's opinion that Mr. Reich has a lot to offer society that can still be achieved by him (and thus the reason for the recommendation by counsel of the community service component of the sentence.)

Pursuant to 18 U.S.C. §3553(a), the Court "shall impose a sentence sufficient but not greater than necessary" to comply with the purposes of sentencing. Thus, the Court must consider: (1) the nature and circumstance of the offense and history and characteristics of the defendant; (2) the need of the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public; (3) all available sentences; (4) the relevant Guidelines ranges, and (5) the need to avoid sentencing disparities.

The Defendant will address the Court at the sentencing hearing reiterating his remorse for his failure in this case and his plan for going forward. A defendant's statement to the Court permits "the defendant to present personal characteristics to enable the sentencing court to craft an individualized sentence." United States v. Ward, 732 F.3d 175, at 181(3rd Cir. 2013). It "is designed to temper punishment with mercy in appropriate cases, and to ensure that sentencing reflects individualized circumstances." United States v. De Alba Pagan, 33 F.3d 125, 129 (1st Cir. 1994). "The right to allocution is the right to have your request for mercy factored into the sentencing decision. " United States v. Barnes, 948 F.2d 325, 329 (7th Cir. 1991). "In an age of staggering crime rates and an overburdened justice system, courts must continue to be cautious to avoid the

6

appearance of dispensing assembly-line justice." Id., 331. This personal interaction between the Court and the defendant "reinforces the individuality of both the defendant and the sentencer", and reaffirms that a sentencing judge must "exercise discretion in a wise and humane way." Kimberly A. Thomas, *Beyond Mitigation: Towards a Theory of Allocution*, 75 Fordham L. Rev. 2641, 2661 (2007).

Included in this memorandum are several letters of support from Mr. Reich's family and friends and business colleagues. Each writes of their intense commitment to a man who has dedicated his life to them in every way: supporting them in all their endeavors, giving unconditional love, and offering a true example of how to live. Each also writes of the painful conversation with Mr. Reich when he told them of his failure, how he was humiliated to fail to live up to his own standards of acceptable behavior, and their continued support of him because of his good character and strong devotion to family. (See Exhibits 4-13)

Mr. Reich's actions in this case are an enormous disappointment to all because of the immediate consequences to Mr. Reich, his family, his career, and the victims of the fraud. His several-year participation in a fraud cannot be simply undone with a word or an apology. It is therefore the quality of his actions after his indictment that are important to use to evaluate the depth of his remorse. He immediately submitted to the Government and the Trustee and demonstrated his willingness to tell the truth about what happened at Transmar and Euromar. This information assisted the Government in holding the necessary parties accountable for their actions, as well as allowed Mr. Reich to publicly accept responsibility for his actions by his guilty plea. That Mr. Reich was so involved in the fraudulent scheme is not a good thing at all. However, it is a testament to Mr. Reich's abilities as a cooperating witness-his candor, his humility, the easy-to-follow nature of his testimony, and his unwavering and complete acceptance of his responsibility - that made him so successful in assisting the Government. As the Government concedes, Mr. Reich has done as well as one can to atone for his crimes, and he should be given substantial benefit for this work.

Mr. Reich is prepared to address the Court directly at sentencing on all the issues raised

7

herein and any other topic of interest to the Court. However, it is clear to Mr. Reich that his criminal conduct in the instant matter was very serious and totally unacceptable. He offers no excuse for his this behavior. In asking for a sentence of home confinement, it not argued that the conduct for which Mr. Reich will be sentenced was insignificant. The basis for this request is that in balancing the seriousness and magnitude of the offense against the extent and value of Mr. Reich's post-arrest assistance in rectifying that failure, the felony conviction, home confinement, post-release supervision, and attendant mega million-dollar judgments are sufficient to satisfy the concerns of §3553a.

Conclusion

For the reasons stated herein, I respectfully request that this Court impose a sentence of time served, 3 years of post-release supervision including 6 months of home detention, 250 hours of community service, no fine in light of the massive restitution and forfeiture orders, and the $100 mandatory special assessment.

I thank the Court for its consideration.

Respectfully submitted,

  s/  Samuel Braverman
Fasulo Braverman & Di Maggio, LLP
Attorneys for Thomas F. Reich
225 Broadway, Suite 715
New York, New York 10007
Tel (212) 566-6213
SBraverman@FBDMLaw.com

Cc:     AUSA Benet J. Kearney and AUSA Daniel M. Tracer (by ECF)

8

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |